IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs October 7, 2014

## LAMARIO HILL v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Shelby County**
**No. 05-08627    Glenn I. Wright, Judge**

---

**No. W2013-02557-CCA-R3-PC  - Filed February 5, 2015**

---

The Petitioner, Lemario Hill, appeals the Shelby County Criminal Court's denial of post-conviction relief from his convictions for first degree felony murder, attempted especially aggravated robbery, and aggravated assault. On appeal, he contends he received ineffective assistance of counsel based on counsel's failure (1) to present a jury nullification defense or any other defense strategy, (2) to promptly investigate his case, and (3) to adequately communicate with him regarding his defense. Upon review, we affirm the denial of post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and TIMOTHY L. EASTER, JJ., joined.

Juni S. Ganguli, Memphis, Tennessee, for the Petitioner, Lamario Hill.

Robert E. Cooper, Jr., Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Charles Summers, III, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

In 2007, the Petitioner was convicted of first degree felony murder, attempted especially aggravated robbery, and aggravated assault and received an effective sentence of life imprisonment. State v. Lemario Hill, No. W207-01741-CCA-R3-CD, 2009 WL 1564806, at *1 (Tenn. Crim. App. June 4, 2009), perm. app. denied (Tenn. Oct. 19, 2009). On direct appeal, this court affirmed the judgments of the trial court, and the Tennessee Supreme Court denied the application for permission to appeal. Id.

**Trial.** The victim testified that on the night of August 23, 2005, he and his brother were working at a convenience store on Southern Avenue in Memphis, Tennessee. Id. As the victim exited the store's front door, he was confronted by two African-American men with white cloths covering their faces. Id. One of these men pulled a gun on the victim and told him to get back inside the store or he would kill him. Id. The victim walked back inside the store and told the men he would give them the money in the store. Id. As the men entered the store, the assailant with the gun fired two shots. Id. One of these shots hit the store's ceiling and the other shot hit and killed the victim's brother, who had approached the front of the store after hearing the confrontation. Id. at *1-2. After the two shots were fired, the assailants fled the store. Id. at *1.

Antonio Lampkins testified that the afternoon of August 23, 2005, he played basketball with the Petitioner, Nicholas Fletcher, and two other men whose names he did not know. Id. At one point, the Petitioner stated that he wanted to rob a store and asked Lampkins if he wanted to assist him, but Lampkins declined. Id. Later, Lampkins, the Petitioner, Fletcher, and a fourth man Lampkins did not know walked toward a store on Southern Avenue. Id. Lampkins did not see any of these men with a gun or with a white cloth covering their faces. Id. Before reaching the store, Lampkins turned around and went home. Id. He said there was no discussion about robbing the store, and he did not believe these men were going to rob the store. Id. Lampkins denied that his cousin Calvin Lyons, who was nicknamed Mookie, was with the Petitioner and Fletcher the night of the robbery or helped plan the robbery. Id. He did not know that an incident had occurred at the store until Fletcher disclosed the incident to him at a later time. Id.

Larry Jones testified that he had been at the store between 9:00 and 9:30 p.m. on August 23, 2005. Id. at *2. Jones left the store and was walking down Southern Avenue toward Boston Street when three men ran past him. Id. He observed the men from the back and saw that one of the men had a handgun at his side and that at least one of the men had a scarf or bandana around his neck. Id.

Sergeant William D. Merritt testified that he and another detective first interviewed the Petitioner in the presence of his mother on August 25, 2005, after the Petitioner and his mother signed a waiver of rights form. Id. He said he orally advised the Petitioner of his rights, presented the advice of rights form to the Petitioner and his mother, and had the Petitioner read the form to confirm that he could read it. Id. Sergeant Merritt stated that the Petitioner appeared to understand his rights, did not ask any questions about his rights, and was able to read the form aloud to him. Id.

Sergeant Merritt stated that the Petitioner first told him that he was not involved in the incident at the store. Id. The Petitioner claimed that he was in the parking lot of the store

and saw several men running from the store. Id. Upon hearing this, the detectives told the Petitioner that they were interviewing other people involved in the incident and that they were going to compare what the Petitioner told them to what these other suspects told them in order to determine what actually happened. Id. At that point, the Petitioner offered a different version regarding the incident. Id. Sergeant Merritt denied that he and the other detective threatened the Petitioner into changing his statement. Id. In the second version of events, the Petitioner claimed that Lampkins, Fletcher, and someone by the name of Treyvaughn were at the Petitioner's house, and Treyvaughn started talking about robbing the store. Id. at *3. The Petitioner said that they all met at the store, put on their masks, and Treyvaughn ran into the store with a gun, although the Petitioner and Fletcher "didn't get a chance to run in." Id. The Petitioner and Fletcher remained at the door of the store and witnessed Treyvaughn shooting at the store clerk. Id. Then the Petitioner and Fletcher ran down Boston Street. Id. The Petitioner looked back to see Treyvaughn exit the store, and they left. Id. The Petitioner said that he wore a white t-shirt over his face during the incident and that Treyvaughn used a .357 Smith & Wesson handgun that he had gotten from the Petitioner's brother, Marqual Hill. Id. He said that two shots were fired during the incident. Id. The Petitioner said that his brother had gotten rid of the handgun the day he gave his statement to police. Id.

Sergeant Merritt said the Petitioner later asked to speak with him and the other detective, and on September 1, 2005, they met with the Petitioner and his court appointed special advocate in juvenile court. Id. The detectives advised the Petitioner of his rights, which he waived before giving a statement admitting that he shot the victim in the store and that the third person with him and Fletcher was not Treyvaughn but a man named Kentori. Id. The Petitioner stated that Kentori was present when the plan was made to rob the store and that Kentori stood outside the store while the Petitioner went inside. Id. The Petitioner said the shooting of the victim "was an accident." Id. Sergeant Merritt stated that officers later contacted Treyvaughn and discovered that he was not in Memphis the night of the shooting. Id.

Sergeant Merritt acknowledged that he had talked to a man named Cordarius Torrey, who had been interviewed by other officers the night of the incident. Id. He admitted that the Petitioner had mentioned someone by the name of Kentori during the first interview but was unsure whether Kentori was Cordarius Torrey or another person because Sergeant Helldorfer had investigated that part of the case. Id. Sergeant Merritt said the identity of the fourth man who was with the Petitioner, Lampkins, and Fletcher the afternoon prior to the shooting was never confirmed. Id.

Sergeant Merritt said that Sergeant Helldorfer had written the following note on the Petitioner's first waiver of rights form: "eighth grade, read aloud with difficulty, slow." Id.

Sergeant Merritt denied telling the Petitioner that his first version of the events was "not right" and denied showing the Petitioner Fletcher's earlier statement to police. Id. He acknowledged that he and the other detective told the Petitioner that they were interviewing several suspects in the case. Id. He denied that they bullied the Petitioner into making his statement. Id.

Sergeant Merritt said Fletcher mentioned Treyvaughn's name and the Petitioner's name during one of the eight versions of events provided by him during his statement. Id. at *4. After the Petitioner mentioned a gun, the Petitioner's mother consented to a search of her house for the gun, although no gun was found there, and no gun was ever recovered in the case. Id. Sergeant Merritt said he was not aware that the Petitioner was mildly mentally retarded, but asserted, "We don't request tests to see if someone is competent to understand their rights. That's out of our realm." Id.

The Petitioner's mother, Betty Hill, testified that after arriving at the police station, the Petitioner initially told the detectives that he was not inside the convenience store when the shooting occurred, but rather was outside the liquor store next door to the convenience store. Id. at *5. Hill stated that although the Petitioner repeatedly told the detectives this version of events, the detectives consistently responded that the Petitioner was involved in the incident. Id. She said one of the detectives told the Petitioner, "I'm tired and I'm ready to go home so tell your mama you were involved. . . . [Y]ou're going to juvenile court anyway when you leave here." Id. At that point, Hill asked the detectives if the Petitioner had been charged with any crime, but the detectives did not answer. Id. The detectives told her and the Petitioner that Fletcher had already informed them that the Petitioner was involved in the incident and then showed them Fletcher's statement. Id.

Hill said that the day of the shooting, she had seen the Petitioner, Fletcher, Lampkins, and two other young men she did not know playing basketball close to her home. Id. As she left for work, she saw these five men standing in her front yard, and Lampkins asked her for a ride home, but she declined because she was late for work. Id. On her way to work, she stopped at one store on Boston Street and then drove past the convenience store, which was surrounded by police and crime scene tape. Id. She said someone outside the store told her that the store had been robbed and that the store's owner had been shot. Id.

Hill said that during the 2004-05 school year, the year prior to the Petitioner's arrest, the Petitioner was seventeen years old, was a freshman at East High School, and had received "all F's" on his report card. Id. She said the Petitioner had spent two years in the eighth grade, where he had received "D's and F's" before receiving a social promotion to the ninth grade. Id. She later acknowledged that the Petitioner had received some B's and C's on his eighth grade report card during the 2003-04 school year. Id. at *6. Hill said that her home

-4-

was approximately three minutes from the convenience store where the crimes had occurred and that she had left her home around 9:45 the night of the shooting. Id.

Rebecca Rutledge, Ph.D., a clinical psychologist, testified that she conducted a psychological evaluation of the Petitioner. Id. When she asked him questions about the day of the incident, the Petitioner's answers were "very vague. . . . He said that he waited outside of a liquor store while his friend went in to buy cigarettes. He said that he heard shots and his friend ran out telling him that they needed to leave. They both ran. And he would not elaborate any further." Id. She added that "[f]rom the way he described what happened that day . . . I would tell you that he probably didn't have a lot of foresight, was likely to be much more impulsive, in other words acting before thinking it through." Id.

Dr. Rutledge said that she administered the Weschler Adult Intelligence Scales, which measured the Petitioner's intelligence quotient (IQ), and that the Petitioner's full scale IQ of 69 "was in the range of mild mental retardation." Id. She noted that the Petitioner gave "very concrete . . . very short" responses to her questions. Id. She explained, "A lot of times he did not understand what I was asking him. If I repeated [a question] several times, he still didn't quite get it. His response time to a question was slow . . . he was struggling." Id.

In addition, Dr. Rutledge administered the Wide Range Achievement test, which measured the Petitioner's math and reading ability. Id. This test showed that the Petitioner was reading at a third-grade level, which made him "functionally illiterate." Id. She said this meant that although the Petitioner would be able to read the word "milk" on a milk carton, he would be unable to understand instructions on a medicine bottle. Id. Dr. Rutledge opined that individuals like the Petitioner would never be able to read beyond a sixth-grade level. Id. She stated that the Petitioner would have been unable to read and understand the rights waiver form provided by the police and that although the Petitioner told him he understood his rights, he did not in fact understand them. Id. The test also showed that his math skills were at a fourth-grade level. Id. Dr. Rutledge administered additional tests to determine that the Petitioner was not malingering. Id.

Dr. Rutledge stated that the Petitioner was able to understand simple questions about the roles of an attorney, a prosecutor, and a jury and was aware that he was "in big trouble." Id. at *7. However, she said the Petitioner "doesn't quite understand all the legalities about it. He doesn't understand how his case is going to be presented . . . his level of appreciation [is] . . . just not very well developed." Id. She stated that the Petitioner was "very acquiescent" in dealing with authority figures and was not very likely to be a "leader." Id. Dr. Rutledge opined that the Petitioner "had a limited understanding of the proceedings against him and a limited capacity to assist in his own defense." Id. However, she

acknowledged that the Petitioner "had the capacity . . . for knowing and purposeful conduct, and . . . he had the ability to appreciate right from wrong." Id.

Dr. Rutledge admitted that the Petitioner had been found competent to stand trial. Id. She also admitted that she had not read the Petitioner's statements, did not know the details or the location of the crimes with which the Petitioner was charged, had not reviewed the Petitioner's school records, and had not talked with the Petitioner's family. Id. She stated that although the Petitioner had taken another test that calculated his IQ to be 85, she said that test resulted in "kind of over[-]inflated IQ scores," and was not a test that she used in her practice. Id.

Marqual Hill, the Petitioner's older brother, testified that on the afternoon of the shooting he saw the Petitioner, Lampkins, Fletcher, and a fourth person named "Bookie," who he believed was Lampkins's cousin. Id. Hill denied owning a gun, hiding a gun at his mother's home, or giving a gun to the Petitioner. Id. Hill said that he saw the Petitioner, Lampkins, Fletcher, and Bookie leave his home but did not know what time they left. Id.

Ronald Lax, a private investigator, testified that he determined that Bookie's real name was Kevin Lyons and that Lyons was Lampkins's cousin. Id. He said that although Bookie lived in Detroit, he was in Memphis the night of the shooting. Id. Lax said Lampkins's family became "very nervous" when he asked about Bookie and claimed that they did not know Bookie's real name. Id.

After being convicted at trial, the Petitioner filed a timely pro se petition for post-conviction relief alleging, in part, ineffective assistance of counsel. Following the appointment of counsel, he filed an amended post-conviction petition.[1]

**Post-Conviction Hearing.** Counsel testified that she had been practicing law since 1991 and had spent eight years as an assistant public defender before going into private practice. She said that at the time she represented the Petitioner, approximately sixty percent of her practice was devoted to criminal defense. She also said she had represented defendants in at least ten first degree murder cases prior to representing the Petitioner.

Counsel said she had been retained and had represented the Petitioner in both juvenile court and criminal court. She obtained funds to have the Petitioner evaluated by Dr.

---

[1] The Order Denying Petition for Post-Conviction Relief references an Amended Petition for Post-Conviction Relief filed by appointed counsel, although the amended petition was not included in the record on appeal. Because the issues raised on appeal were sufficiently outlined in the Petitioner's pro se petition and addressed at the post-conviction hearing, we will address these issues on their merits.

Rutledge, who testified at trial. The results of this evaluation showed that the Petitioner was "mildly mentally retarded," which limited his ability to assist her during his case. Counsel said that when she learned of the Petitioner's intellectual disability, she questioned whether he was competent to stand trial and whether he was able to form the intent required for the charged offenses. Although she shared the results of Dr. Rutledge's evaluation with the State, she never received an offer for the Petitioner to plead guilty to a lesser offense.

The Petitioner told counsel that he was not involved in the incident and that he was waiting in the parking lot of the convenience store when the offenses occurred. However, she said the Petitioner gave two or three different versions of what happened. The Petitioner initially told the police that someone named Treyvaughn shot the store clerk. After being shown a co-defendant's statement implicating him in the shooting, the Petitioner later admitted to police that he had shot the store clerk. Counsel said that prior to trial she discovered that Treyvaughn was in Milwaukee at the time of the incident in this case. She was unable to suppress the Petitioner's statements on the basis that the Petitioner did not understand his rights and that the police coerced the statements. She stated that the Petitioner's ability to read was far below an eighth-grade reading level, which was the level of information on the advice of rights form.

Counsel explained that three men were indicted for the crimes in this case. She said that Antonio Lampkins, who knew that a robbery was being planned but decided not to participate, testified against the Petitioner at trial. Lampkins was never indicted for the offenses in this case.

Although the Petitioner was arraigned in December 2005, counsel first obtained funds to hire an investigator to assist in the Petitioner's case in May 2006. She said the investigator, Ronald Lax, was tasked with locating witnesses because the Petitioner was unable to provide any witnesses helpful to his case. Counsel said Lax knocked on twenty-six doors near where the incident occurred and "interviewed a lot of witnesses" but was unable to find any helpful witnesses. She also said Lax attempted to take a statement from Lampkins on March 22, 2007. Counsel was sure that she had a statement from Lampkins in her file, although she was unable to find it. She said Lampkins's story was that he never made it inside the convenience store where the offenses occurred because he decided not to participate. Counsel stated that Lampkins's version of events was not helpful to the Petitioner's case because it did not corroborate the defense theory that the Petitioner also chose not to participate in the offenses. She asserted that Lax obtained a statement from one of the indicted co-defendants and had talked to some other witnesses on March 12, 2007. In addition, Lax talked with Cordarius Torrey, but Torrey was not helpful to the case. Counsel was unable to remember why she waited five months to ask for an investigator in the Petitioner's case.

Counsel acknowledged that the Petitioner's intellectual disability made him a more sympathetic defendant. She stated that the issue of jury nullification did arise in the Petitioner's case because the jury sent out a note during deliberations indicating that it did not want to convict the Petitioner. She objected to the trial court responding to the jury's note, arguing that if the court was going to "reiterate one part of the jury charge, then [it should] reiterate the part about the jury [being] the sole judges of the facts and the law in the case[.]" The trial court overruled her objection and instructed the jury that if it "found beyond a reasonable doubt that [the Petitioner] was involved in the robbery, then [it] had to find him guilty." When asked if jury nullification was a part of her strategy at trial, counsel replied, "[J]ury nullification is permissible, but . . . it can't be a part of your strategy." She said that the jury's sympathy for the Petitioner at trial was an unintended consequence of the proof the defense presented. Although she considered allowing the Petitioner to testify in order to show his intellectual disability to the jury, she ultimately believed that it was unwise to have him testify given the impediments of his disability and his conflicting statements, including his confession to shooting the store clerk. Although the issue of whether the Petitioner should testify was discussed at length with the Petitioner and his family, counsel said that the decision not to testify was made by the Petitioner and the Petitioner alone. She explained that other witnesses testified at trial about the Petitioner's intellectual disability and his inability to withstand the officers' interrogation tactics.

Counsel said her defense theory was that the Petitioner, who had diminished capacity because of his intellectual disabilities, had known a robbery was going to occur but, like Lampkins, had decided not to participate in the robbery and was not the ring leader. She said the defense tried to locate witnesses that would support this defense theory. However, she acknowledged that the Petitioner never mentioned an alibi defense and never claimed he was not present at the scene when the incident occurred.

Counsel said that she met with the Petitioner's family several times during the case and met with the Petitioner in jail. She stated that the Petitioner's "ability to aid in his defense [was] very, very limited[,] and we knew that." Counsel said she did everything she could to develop the best defense theory for the Petitioner given the evidence and the adverse rulings of the court, including the court's denial of her motion to suppress his statements. She said she could think of nothing else that she wished she had done to present a better case to the jury.

The Petitioner, age twenty-three, testified that he was fifteen or sixteen years old when he was charged with first degree murder. He admitted that he gave more than one statement to police about the incident. The Petitioner said he told counsel he was not involved in the robbery and murder because he and his co-defendant, Nicholas Fletcher, were standing in the store's parking lot when the incident occurred. He also told her Cordarius Torrey, who was

on Belt Line Street next to the store, could corroborate his claim that he was standing in the parking lot of the store when the incident occurred.

The Petitioner admitted that counsel met with him "some" about his case. However, he claimed that counsel had not adequately communicated with him regarding his defense. Although the Petitioner admitted that counsel had given him a copy of his discovery materials, he claimed that he was unable to read and write well at that time, which prevented him from understanding the discovery materials and that counsel never explained the discovery materials to him. The Petitioner also asserted that he had not understood what was happening at trial.

The Petitioner admitted that he requested a meeting with the police before giving the statement confessing to shooting the store clerk. He acknowledged that he was present when counsel attempted to get his statements suppressed based on police coercion and his confusion at the time of the statement. However, he said he thought he told counsel that he gave the statement confessing to the shooting because individuals were threatening his family.

The Petitioner admitted that counsel had met with him more than once but could not state the exact number of times. Although he acknowledged that Cordarius Torrey's alleged testimony was at odds with his admission to police that he shot the clerk, he insisted that Torrey's testimony would have been beneficial to his case. The Petitioner stated that he did not know if he believed counsel was ineffective in failing to investigate Antonio Lampkins. He asserted that Lampkins's testimony was relevant to his case but was unable to explain how Lampkins, who never made it to the store, would have been able to help in his defense. The Petitioner admitted that counsel had talked to him and his family about whether he should testify at trial and that he, alone, had made a knowing waiver of his right to testify.

Following the evidentiary hearing, the post-conviction court took the petition under advisement. The court later filed an order denying post-conviction relief. The Petitioner then filed this appeal.

## ANALYSIS

The Petitioner contends that counsel was ineffective because she failed to present a jury nullification defense or any other defense strategy, failed to obtain investigative services at the beginning of his case, and failed to adequately communicate with him regarding his defense.

Post-conviction relief is only warranted when a petitioner establishes that his or her conviction or sentence is void or voidable because of an abridgment of a constitutional right. T.C.A. § 40-30-103. The Tennessee Supreme Court has held:

A post-conviction court's findings of fact are conclusive on appeal unless the evidence preponderates otherwise. When reviewing factual issues, the appellate court will not re-weigh or re-evaluate the evidence; moreover, factual questions involving the credibility of witnesses or the weight of their testimony are matters for the trial court to resolve. The appellate court's review of a legal issue, or of a mixed question of law or fact such as a claim of ineffective assistance of counsel, is de novo with no presumption of correctness.

Vaughn v. State, 202 S.W.3d 106, 115 (Tenn. 2006) (internal citations and quotation marks omitted); see Felts v. State, 354 S.W.3d 266, 276 (Tenn. 2011); Frazier v. State, 303 S.W.3d 674, 679 (Tenn. 2010). A post-conviction petitioner has the burden of proving the factual allegations by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. R. 28, § 8(D)(1); Dellinger v. State, 279 S.W.3d 282, 293-94 (Tenn. 2009). Evidence is considered clear and convincing when there is no serious or substantial doubt about the accuracy of the conclusions drawn from it. Lane v. State, 316 S.W.3d 555, 562 (Tenn. 2010); Grindstaff v. State, 297 S.W.3d 208, 216 (Tenn. 2009); Hicks v. State, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. Vaughn, 202 S.W.3d at 116 (citing Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975); Strickland v. Washington, 466 U.S. 668, 687 (1984)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996) (citing Strickland, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the petitioner establishes that his attorney's conduct fell "below an objective standard of reasonableness under prevailing professional norms." Id. at 369 (citing Strickland, 466 U.S. at 688; Baxter, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome.'" Id. at 370 (quoting Strickland, 466 U.S. at 694).

"In evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." State v. Burns, 6 S.W.3d 453, 462 (Tenn. 1999) (citing Strickland, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." Strickland, 466 U.S. at 688-89. However, "'deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting Goad, 938 S.W.2d at 369).

First, the Petitioner contends that counsel was ineffective in failing to present a jury nullification[2] defense or "any alternative theory of defense," which resulted in his convictions. He claims that because "the facts of the case were difficult," counsel had a duty to explore every available defense, including a defense of jury nullification. As support for his claim, he cites to counsel's post-conviction testimony that jury nullification could not be a part of the defense strategy even though the Petitioner was a sympathetic defendant. We agree with the post-conviction court's determination that the Petitioner was not entitled to relief on this issue.

Despite the Petitioner's arguments to the contrary, a defendant does not have a constitutional right to jury nullification. See Strickland, 466 U.S. at 694-95 ("An assessment of the likelihood of a result more favorable to the defendant must exclude the possibility of arbitrariness, whimsy, caprice, 'nullification,' and the like. A defendant has no entitlement to the luck of a lawless decisionmaker, even if a lawless decision cannot be reviewed."); State v. Paul Allen St. Clair, No. M2012-00578-CCA-R3-CD, 2013 WL 1611206, at *6 (Tenn. Crim. App. Apr. 16, 2013), perm. app. denied (Tenn. July 12, 2013) ("[A jury's] failure to follow the law is nothing but a windfall to the defendant because he does not enjoy a personal right to jury nullification."); Jerry Lee Craigmire v. State, No. 03C01-9710-CR-0040, 1999 WL 508445, at *13 (Tenn. Crim. App., at Knoxville, Jul. 20, 1999) ("A defendant does not possess a constitutional right, whether pursuant to the due process

---

[2] Jury nullification occurs when a jury, after deciding not to follow the applicable law or deciding to ignore the proof, either acquits the defendant or finds the defendant guilty of a lesser included offense. See State v. Taylor, 771 S.W.2d 387, 397 (Tenn. 1989); State v. Paul Allen St. Clair, No. M2012-00578-CCA-R3-CD, 2013 WL 1611206, at *6 n.1 (Tenn. Crim. App. Apr. 16, 2013), perm. app. denied (Tenn. July 12, 2013).

provisions of the state and federal constitutions or embodied in those documents' guarantees of a right to a trial by an impartial jury, to place the issue of jury nullification before a jury in a criminal trial."). Moreover, counsel should not encourage jury nullification. See State v. Shropshire, 874 S.W.2d 634, 640 (Tenn. Crim. App. 1993) ("[A] trial court cannot be held in error for prohibiting a defendant from advising a jury not to follow the law as the trial court instructs it."); Jerry Lee Craigmire, 1999 WL 508445, at *13 ("[W]e conclude that the trial court correctly prohibited defense counsel from arguing jury nullification."); see also United States v. Sepulveda, 15 F.3d 1161, 1190 (1st Cir. 1993) ("[W]hile jurors may choose to flex their muscles, ignoring both law and evidence in a gadarene rush to acquit a criminal defendant, neither the court nor counsel should encourage jurors to exercise this power."). Counsel testified that while jury nullification was not a part of her defense strategy, the issue of jury nullification did arise when the jury sent a note indicating that it did not want to convict the Petitioner. She tried to prevent the court from instructing the jury that if it found beyond a reasonable doubt that the Petitioner was involved in the robbery, then it had to find him guilty. She also argued that if the court was going to reiterate that charge, then it should also reiterate the charge that the jury was the sole judge of the facts and the law. Based on the authority cited above, we agree with the post-conviction court that counsel was not ineffective in failing to present the issue of jury nullification.

Moreover, despite the Petitioner's claims, counsel did, in fact, present a defense theory, namely that the Petitioner, who had diminished capacity because of his intellectual disability, had known that a robbery was going to occur but decided not to participate. We agree that counsel was not ineffective in presenting this defense, given the substantial evidence against the Petitioner and the absence of favorable witnesses. Counsel testified that she obtained funds to have the Petitioner evaluated by Dr. Rutledge, who determined that the Petitioner was "mildly mentally retarded" but competent to stand trial. Although she showed the results of this evaluation to the State, she was unable to receive an offer for the Petitioner to enter a guilty plea to lesser included offense. She also obtained funds to hire an investigator, who interviewed the known witnesses in this case and attempted to locate unknown witnesses, though he was unable to find any witnesses helpful to the Petitioner's case. Counsel stated that she filed a motion to suppress the Petitioner's statements to police, including his statement confessing to shooting the store clerk, but the court denied the suppression motion. We conclude that counsel employed this defense strategy after more than adequate preparation. The record fully supports the post-conviction court's finding that counsel's decision to pursue this particular defense strategy was neither deficient nor prejudicial. Consequently, the Petitioner is not entitled to relief.

Second, the Petitioner argues counsel was ineffective in failing to obtain investigative services at the beginning of his case, which he claims would have uncovered witnesses helpful to his defense. He asserts that although counsel began representing him in December

2005, she did not obtain investigative assistance until May 2006 and did not investigate key witnesses until March 2007, and she never provided any explanation for the delay. He also argues that although counsel claimed her investigators met with Antonio Lampkins, the investigators never actually spoke to Lampkins and attempted only one interview with him in March 2007.

Initially, we note that although the Petitioner mentions Lampkins in his brief as a favorable witness, he fails to identify any other witnesses that would have been beneficial to his case. More importantly, the Petitioner failed to present Lampkins or any other witness helpful to his case at the evidentiary hearing. In considering this issue, the post-conviction court found that the Petitioner had failed to show that counsel was deficient because counsel obtained funds to hire an investigator, who interviewed known witness and conducted a search for unknown witnesses. In addition, the court determined that the Petitioner had failed to establish that he was prejudiced by counsel's alleged failure to discover any witnesses because he had failed to present these witnesses at the post-conviction hearing. We agree.

"When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The presentation of the witness at the post-conviction hearing is typically the only way for the petitioner to establish:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.

Id. Neither the post-conviction court nor this court may speculate on "what a witness's testimony might have been if introduced by defense counsel." Id. The record fully supports the post-conviction court's findings. The Petitioner has failed to show how a more prompt investigation would have revealed witnesses helpful to his defense and has failed to show what critical testimony these witnesses would have provided. Accordingly, as to this issue, the Petitioner has failed to establish that counsel's performance was deficient or prejudicial.

Third, the Petitioner contends that counsel was ineffective in failing to adequately communicate with him regarding his defense. He claims that counsel's visits with him were "sparse," "brief," and "unproductive." He also claims that because of his intellectual disabilities, he was unable to understand the information, including the discovery materials,

that counsel gave him during their meetings. As to this issue, the post-conviction court found that counsel met with the Petitioner and informed him of the details regarding his case. The court held that given the Petitioner's intellectual disabilities, it was unlikely that he would have fully understood any of counsel's communications to him about his case. The record does not preponderate against the post-conviction court's findings of fact.

Counsel testified that the Petitioner, who had been determined by Dr. Rutledge to be "mildly mentally retarded," was unable to fully participate in his defense and could not provide any witnesses helpful to his case. Although counsel met with the Petitioner in jail, she also met with the Petitioner's family several times during the case because the Petitioner's "ability to aid in his defense [was] very, very limited[,] and we knew that." The Petitioner conceded that counsel met with him "some" regarding his case. Based on the record, we agree with the post-conviction court that the Petitioner failed to show how counsel was deficient and failed to establish how he would have received a more favorable outcome at trial if counsel had done a better job of communicating with him. Consequently, the Petitioner is not entitled to relief.

## CONCLUSION

Because the Petitioner has failed to establish that he was denied effective assistance of counsel, the judgment of the post-conviction court is affirmed.

_____
CAMILLE R. McMULLEN, JUDGE

-14-